## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

John Christopher Pope, Jr.,

                                 Plaintiff,

v.

                                         **COMPLAINT**

Derek Chauvin, acting in his individual         **Jury Trial Demanded**
capacity as a Minneapolis police officer;       **Under FRCP 38(b)**
Alexander Walls, acting in his individual
capacity as a Minneapolis police officer;
Joshua Domek, acting in his individual
capacity as a Minneapolis police officer;
David Nerling, acting in his individual
capacity as a Minneapolis police officer;
Graham Plys, acting in his individual
capacity as a Minneapolis police officer;
David Robins, acting in his individual
capacity as a Minneapolis police officer;
Lucas Peterson, acting in his individual
capacity as a Minneapolis police Sergeant;
and the City of Minneapolis,

                                  Defendants.

_____

       For his Complaint, Plaintiff John Christopher Pope, Jr. ("John") states and alleges as follows:

## INTRODUCTION

       1.     This is an action for money damages for injuries sustained by John as a result of the gratuitous use of excessive force by then-Minneapolis Police Department (MPD) officer Derek Chauvin on September 4, 2017, when John was a mere 14 years old.

2.     Defendant Chauvin was a long-troubled officer with a documented pattern of misconduct.  He actively sought to prey on compliant Black arrestees, including John, Zoya Code, and George Floyd, among others.  But consistent with its custom and practice of tolerating (if not encouraging or ratifying) misconduct by its officers, MPD allowed Defendant Chauvin's outrageous conduct to continue unabated.  John was one of many unfortunate victims of Defendant Chauvin's racist policing and unchecked use of excessive force.

3.     Moreover, per MPD's longstanding customs and practices, Defendants Alexander Walls, Joshua Domek, David Nerling, Graham Plys, David Robins, and Sergeant Lucas Peterson, who were other MPD officers at the scene of Defendant Chauvin's use of excessive force against John, failed to intervene to stop Defendant Chauvin.

4.     Making matters worse, Defendant Sergeant Peterson later reviewed and *approved* Defendant Chauvin's unlawful use of force against John – despite having observed at least some of it firsthand.

5.     The City of Minneapolis's longstanding custom and practice of unchecked Fourth Amendment violations committed by MPD officers against its citizenry, and its tolerance and ratification of widespread racist policing by its officers, were moving forces behind the violation of John's constitutional rights.

6.     Defendant Chauvin's repeated use of excessive force culminated in his May 25, 2020 murder of George Floyd outside the Cup Foods store in Minneapolis, slowly

asphyxiating the handcuffed, face-down, non-resistant Floyd by pressing his knee into the back of Floyd's neck for more than eight minutes, with the assistance and protection of three other MPD officers. This kneeing maneuver was Defendant Chauvin's calling card, having used it against John, Zoya Code, George Floyd, and likely many others.

7.     The City knew its officers, including Chauvin, were applying force to the backs and necks of prone (lying on their stomach) arrestees, despite the known, appreciated, and obvious risk of causing serious injury or death from positional asphyxia. Indeed, the City contracted for and kept a library of digital evidence on its cloud-storage site for body-worn camera (BWC) recordings, known as Evidence.com. But the City buried its head in the sand regarding such evidence or even worse, reviewed it and did nothing, in either case continuing to condone such actions by officers. More gallingly, the City even *continued to train officers to use such neck restraints*.

8.     Consistent with that training, Defendant Chauvin snuffed the very life out of George Floyd.

9.     Mr. Floyd's murder was witnessed and filmed by a brave and broad group of citizens, including at least one minor, who protested Defendant Chauvin's and his "cover" officers' actions. Subsequent broadcasts of their recordings, and the officers' own BWC recordings from Evidence.com, finally led to accountability for Defendant Chauvin, who was eventually fired and convicted of murder, as well as criminally violating Floyd's and John's federal civil rights.

10.     Like most aspects of the illegal policing practices in which the MPD has engaged for decades, the City's preference even after the murder of Mr. Floyd would have been to stick with business as usual.  It took the courage of civilians, and later jurors, to stop Defendant Chauvin.

11.     But while still employed by the City of Minneapolis and MPD, Defendant Chauvin was a serial predator who was never stopped by the City—a walking *Monell* violation—and who fully embraced the City's training on dangerous restraint techniques. John – like Code, Floyd, and others – suffered the consequences.

## THE PARTIES

12.     John is, and was at all times material herein, a citizen of the United States and a resident of the State of Minnesota.  John is Black and was fourteen years old on September 4, 2017.

13.     John asserts Fourth and Fourteenth Amendment claims under 42 U.S.C. §§ 1983 and 1988 against Defendants Chauvin, Walls, Domek, Nerling, Plys, Robins, and Peterson in their individual capacities, for misconduct occurring under color of state law.

14.     Defendant Chauvin was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

4

15.     Defendant Walls was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

16.     Defendant Domek was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

17.     Defendant Nerling was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

18.     Defendant Plys was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

19.     Defendant Robins was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

20.     Defendant Peterson was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD Sergeant.

21.     John further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and Title VI of the Civil Right Act of 1964, 42 U.S.C. § 2000d *et seq*.

22.     The MPD is not a separately suable entity but rather is an arm of the City.

The City is a municipality duly incorporated under the laws of the State of Minnesota.

23.     John's causes of action arise purely out of federal law.  State-law claims

and, by consequence, limitations and defenses under state law are not applicable to this

civil-rights lawsuit.

24.     Original jurisdiction over this matter exists pursuant to 28 U.S.C. §§ 1331

and 1343(a)(3).

25.     The events giving rise to this action occurred in the City of Minneapolis.

Venue is thus proper in this Court under 28 U.S.C. § 1391(b)(2).

## THE CITY ENCOURAGES AND ENABLES RACIST, PREDATORY POLICE OFFICERS AND UNCONSTITUTIONAL FORCE PRACTICES

26.     The City fulfills its policing functions through the MPD, which has a long

history of looking the other way when its officers engage in misconduct.

27.     Indeed, MPD's history of using excessive force dates back to at least the

1980s.  From 1983 to 1987, 227 complaints of excessive force were filed against MPD

officers, and yet none was upheld by the City.[1]

28.     The misconduct continued over the ensuing years.  By summer 1994, a

federal jury concluded that the City maintained a custom of deliberate indifference to

complaints about excessive force within MPD.  Even this did not spur change at the

police department.

---

[1] https://www.thenation.com/article/society/minneapolis-police-brutality-racism/

29.     The widespread misconduct by MPD officers persisted into the 21st century.  Data published in the Minneapolis *Star Tribune* on August 17, 2013, revealed that MPD officers were then defendants in 61 lawsuits.[2]

30.     One of those lawsuits was commenced by Darryl Gill, a Black man who had a dreadlock ripped out by MPD officer Sundiata Bronson, who then broke Gill's wrist while he was handcuffed.  Both actions by Bronson constituted excessive force.

31.     Notably, Bronson did so less than a year after he used excessive force on Melvin Dickerson, another Black man.  Bronson slammed Dickerson's face into a plate-glass window, causing injuries including 22 sutures.

32.     But MPD took no action, and Bronson kept trampling citizens' civil rights.  In 2012, Bronson assaulted Zachary King, who also is Black, for lawfully carrying a firearm with a permit, landing King in the hospital.  The City settled King's subsequent civil-rights lawsuit for $122,000.[3]

33.     By the time Bronson finally retired in 2014, there had been at least thirteen citizen complaints lodged against him – and yet the only discipline imposed upon him was for improperly operating his squad car in one instance.  All told, the City paid out

---

[2] https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/?refresh=true

[3] https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1626645114/Sundiata_Bronson.pdf?1626645114

more than a half million dollars to settle six lawsuits in which Bronson was accused of misconduct.[4]

34.     Bronson is far from the only MPD officer mollycoddled by the City despite clear use of improper and excessive force and predatory, racist conduct.

35.     In August 2009, for instance, MPD officer Joel Pucely threw to the ground and punched Ira Stafford during a traffic stop in which Stafford was not resisting.  The stop culminated with an officer pressing a knee into Stafford's back while he was on the ground in the prone position.  The City settled Stafford's subsequent lawsuit.

36.     Pucely, who remains an MPD officer today, has had at least nine citizen complaints lodged against him; none were sustained by the City.

37.     Another lawsuit alleged that in October 2014, two MPD officers – including Tou Thao, one of the officers involved in George Floyd's murder – punched, kicked, and kneed Lamar Ferguson, who is Black, after he had been handcuffed.  The City settled Ferguson's subsequent lawsuit, too.

38.     Like Bronson and Pucely, numerous complaints had been lodged against Thao, with none sustained and no discipline imposed.

39.     These are just mere examples of many.  In total, the City has paid out over $70,000,000 in the last two decades alone as a result of the unconstitutional use of force by MPD officers.

---

[4] *Id.*

8

40.     Rather than deal with the problem, the City – through a variety of bodies including the City Council, the Mayor, the City Attorney's Office, and a number of faux police "oversight" boards – enables MPD to the detriment of its citizens, who are the subjects of unconstitutional force practices, and its taxpayers foot the bill.

41.     The longstanding culture of the MPD instills knowledge among the rank-and-file that they can make unconstitutional force decisions with impunity.  The *Star Tribune* reported that the City's "12 costliest settlements from 2006 to 2012 resulted in no officer discipline."[5]

42.     This "business as usual" would have continued with regard to Defendant Chauvin even after he murdered George Floyd, but for civilians who witnessed and filmed the events culminating in his death.

43.     MPD's policies, practices and customs, along with its longstanding failure to discipline offending officers, have led to a pattern and practice of excessive force by MPD officers.

44.     MPD's history of misconduct has been so pervasive, in fact, that it has led to investigations into the department's policing practices by both the United States Department of Justice and the Minnesota Department of Human Rights (DHR).

---

[5] https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/

45.     On April 27, 2022, the DHR published a 72-page report detailing its findings after a nearly two-year investigation into MPD's policing practices.[6]

46.     That investigation included reviewing over 700 hours of BWC footage from MPD officers and nearly 480,000 pages of documents; observing 87 hours of MPD Academy trainings for newly hired police officers; participating in multiple "ride-alongs" with MPD officers in each of MPD's five precincts; analyzing a decade of MPD data regarding officers' uses of force and nearly 3-1/2 years' worth of data on MPD traffic stops and prosecutions; and reviewing use-of-force files and police-misconduct complaints and investigations.

47.     The DHR also interviewed, *inter alia*, current and former MPD officers (from the rank of Chief down to the rank of patrol officer) and staff members, City staff involved with public safety, prosecutors from the City Attorney's and Hennepin County Attorney's Offices, other public-safety employees such as firefighters, health-care professionals and attorneys in the Twin Cities area, and more than 2,200 community members.

48.     After completing this "comprehensive investigation," the DHR concluded that excessive force and lack of accountability are institutional norms at the MPD and have been for years.

---

[6] A true and correct copy of the DHR's April 27, 2022 report is attached as Exhibit A.

49.     One of the key problems, the DHR reported, is that MPD officers and supervisors receive improper training "which emphasizes a paramilitary approach to policing that results in officers unnecessarily escalating encounters or using inappropriate levels of force."

50.     Indeed, the DHR found that as a result of MPD emphasizing aggression during training, officers repeatedly "us[e] inappropriate levels of force with community members" and "resort to higher levels of physical force . . . even when the individual does not pose an imminent threat to officers or others."

51.     MPD also "reinforces a culture of unquestionable compliance" amongst its officers, and its training "establish[es] a warrior mindset with officers from their very first day as new MPD officer hires."

52.     Such "unquestionable compliance" is antithetical to the Constitution of the United States and MPD's own policies, including an officer's "duty to intervene or duty to report unauthorized use of force," as the DHR noted.

53.     Each of these – the inappropriate use of force, the failure to intervene to stop that force, and the failure to properly report unauthorized force – happened with respect to the incident with John on September 4, 2017.

54.     Furthermore, these problems are baked into MPD's field-training program, in which rookie officers are paired with veteran officers for on-the-ground training.  Field trainers "have a lasting impact on rookie officers," yet these veteran officers receive no

11

real instruction on how to mentor and train young officers, or more importantly, how not to.

55.     Making matters worse, MPD routinely allows veteran officers to serve as field trainers despite reports or findings of misconduct against them.  As the DHR noted, "[i]f a field training officer uses unauthorized force or otherwise exhibits police misconduct while they are training a rookie officer, then they are training that rookie officer that using unauthorized force is, in fact, acceptable and even expected."  This is an especially serious problem in an environment in which new officers are expected to demonstrate "unquestioned compliance" with senior officers, particularly because field-training officers "play a significant role in determining whether a rookie officer ultimately passes their probationary period."

56.     The DHR report also found fault with MPD's "accountability systems," noting that they are "insufficient and ineffective at holding officers accountable for misconduct."  MPD's Internal Affairs Unit and the Office of Police Conduct Review are simply toothless tigers that failed to provide any "meaningful independent review" of challenged conduct, particularly because "MPD officers and/or supervisors are embedded in the review process."

57.     For example, uses of force are initially reviewed by shift supervisors, typically Sergeants.  Yet, those supervisors themselves often have been accused of or engaged in misconduct, including the use of excessive force.

58.     In other words, at MPD the foxes guard the hen house.

12

59.     Most often, especially when criminal or civil liability or discipline is a likelihood, the so-called "review" of alleged misconduct is farcical.  Despite having at their disposal critical pieces of objective evidence – most notably BWC videos of officers at the scene, but also (among other things) MPD training materials, third-party videos, and weapon-system-manufacturer recommendations and warnings – the "investigators" ignore that objective evidence because the "review" actually is designed to avoid accountability rather than identifying and addressing misconduct.  These "investigations" are intentionally skewed so that they amount to no real investigation at all, ending with a pre-ordained result in which either no discipline or impotent "counseling" is imposed, doing nothing to effect change.

60.     In short, instances of misconduct, according to the DHR report, are "not properly investigated, not timely addressed, and officers are not consistently held accountable," even when BWC evidence or other objective evidence contradicts an officer's use-of-force reporting.

61.     This explains why Defendant Chauvin was so nonchalant when he murdered George Floyd on film and violated the civil rights of John, Zoya Code, and others while being filmed by MPD's own BWC equipment.

62.     By ignoring BWC videos and otherwise, MPD supervisors simply do not "adequately review[] and assess[] inaccuracies or false statements made by officers in their use of force reports."

63.     This, too, was true of Defendant Sergeant Peterson's "review" of the use of force against John on September 4, 2017.  Indeed, the incident with John is specifically mentioned on page 43 of the DHR's report.

**MPD leaders do not hold supervisors accountable for their inadequate review of officers' use of force.** In one case from 2017, a supervisor approved the use of force of an MPD officer who came into a bedroom to find an unarmed Black 14-year-old sitting on the floor using his phone. When the 14-year-old did not immediately stand up when instructed to do so, the officer quickly hit the 14-year-old with their flashlight, splitting his ear open, and then grabbed him by the neck and placed him in an unconscious neck restraint. By deeming this officer's use of force appropriate, the supervisor effectively authorized the officer to continue using such egregious force in the future.

64.     Without a fair, objective, "non-biased" and consistently applied system of oversight in place, nothing will change.  City and MPD leaders have known this for years but have refused to do anything about it.

65.     Yet, a hyper-aggressive, paramilitary culture resulting in the repeated use of unlawful and excessive force by police officers, and the lack of effective accountability systems, are not the only problems plaguing the MPD.

66.     MPD also suffers from a serious racism problem.

67.     The problem is so ingrained and so pervasive, in fact, that the DHR found probable cause to conclude that MPD "engage[s] in a pattern or practice of race discrimination."

14

68.    For example, in its findings the DHR determined that MPD "maintains an organizational culture where officers consistently use racist . . . language" but did not "uniformly and consistently hold officers accountable" therefor.

69.    Indeed, over the 11-year period between January 2010 and April 2021, "MPD rarely disciplined officers" for using racist language.

70.    The DHR's report noted that MPD officers <u>and supervisors</u> used racial slurs, including calling Black persons "niggers," "monkeys," "orangutans," and "Black bitches."  Black MPD officers were no exception – the DHR found that officers referred to their Black colleagues as "nappy head" and "cattle."

71.    Far worse, the DHR found that Black members of the community were more likely to be targeted for law-enforcement action by MPD officers.

72.    It noted that MPD officers were more likely to stop vehicles occupied by people of color, more likely to search those vehicles, and more likely to use force against and arrest those vehicle occupants.

73.    Simply put, the DHR found significant statistical differences in the way Black individuals and white individuals are treated in similar circumstances.

74.    The ingrained racist culture at the MPD, along with its training emphasizing aggressive, militaristic tactics and the lack of effective accountability processes, combine to provide a perfectly toxic environment for officers to violate the Constitution and mete out excessive force against persons of color with impunity and without fear of repercussion or negative consequences.

15

75.     The DHR's investigation bears that out.  Among other things, the DHR concluded that MPD officers "use higher rates of more severe force against Black individuals than white individuals in similar circumstances" and that "race is the likely reason."

76.     This racist, paramilitary culture was a direct cause of the Defendant Chauvin's inhumane degradation of John on September 4, 2017, and the other Defendant officers' failure to take any steps to stop it.

77.     Persons at the highest levels of City government and the MPD, including several Chiefs of Police, have long been aware of the widespread, unlawful use of force by MPD officers and have repeatedly failed to address it.  They have been complicit in the lack of accountability.

78.     Indeed, the DHR found that MPD's Chiefs have been reluctant over the years to impose discipline, allowing investigations to sit on their desks without final review or a disciplinary decision for an average of nearly 15 months.

79.     Likewise, every monetary settlement of a lawsuit against the MPD requires approval—read, knowledge—by the Mayor and the Minneapolis City Council.  But nothing has been done.

80.     As with excessive force and lack of accountability, the racist culture at MPD also did not go unnoticed at the highest levels of City government or by MPD commanders.

16

81.     As the DHR reported, "City and MPD leaders have been aware of deep organizational culture problems within the MPD resulting in the long-standing, disproportionate impact of race based policing on people of color."

82.     Indeed, "[f]ormer and current Mayors, City officials, Police Chiefs, and high-level MPD officials *acknowledge* that there is a problem with MPD's organizational culture that results in racial disparities."

83.     Despite their knowledge, City and MPD leaders let the problems spread for years.

84.     The "lack of collective and sustained action among City and MPD leaders," the report noted, "has, in effect, allowed this organizational culture to fester within MPD and resulted in unlawful policing practices that undermine public safety."

85.     And as a result of the absence of any "coordinated and sustained action to address racial disparities in policing, leaders have allowed MPD to maintain an organizational culture that . . . is averse to accountability."

86.     Indeed, there has been zero accountability by the City or MPD for any of the Defendant officers' misconduct regarding their actions towards John in September 2017.  Quite the contrary, supervisor Defendant Sergeant Peterson actually *approved* that conduct.

87.     Even in the face of the DHR's comprehensive report, some City and MPD leaders still reflexively bristle at the notion that there are widespread problems with the City's police force.  For example, the DHR noted that when confronted with evidence of

systemic racism, "some City and MPD leaders, as well as some MPD officers, claim that disproportionality in policing in Minneapolis is due to factors other than race."

88.     Minneapolis Mayor Jacob Frey called the DHR's findings "repugnant, at times horrific" and claimed he was "outraged."  This is but another example of a City leader talking loudly while saying nothing.

89.     Likewise, the *Star Tribune* reported on May 20, 2022, that City leaders had stopped discussions with the DHR on efforts to reform the MPD because they refused to accept some of the DHR's findings without documentary evidence of the same.[7]

90.     The City Attorney's Office claimed it had demanded such evidence from the DHR but that the DHR "repeatedly refused to share this vital information."

91.     This is a particularly ironic assertion, given that the City Attorney's Office routinely shields BWC evidence from persons subjected to excessive force by MPD officers, under the guise of pretended confidentiality concerns under the Minnesota Government Data Practices Act.

92.     The same bogus claims of confidentiality have occurred here.  John has not yet been given a copy of any of the BWC videos capturing Defendant Chauvin's *admittedly* unlawful use of force against him.  He is entitled to unfettered access to those BWC videos.

---

[7] https://www.startribune.com/minneapolis-halts-police-reform-talks-state-human-rights-officials-lack-evidence-social-media-spying/600175169/?refresh=true

93.     The DHR's report highlighted other systemic issues at MPD that impacted John, as well.

94.     One particular method of unconstitutional, discriminatory force emphasized by the DHR in its report concerned neck restraints.

95.     The DHR noted that MPD officers were almost *twice as likely* to use neck restraints against Black individuals than white individuals when confronted with similar situations.

96.     Notably, the City has been aware for years that MPD officers were restraining subjects – especially Black subjects – in ways that were likely to cause death or serious bodily injury.

97.     On September 9, 2010, white MPD officers Timothy Gorman and Timothy Callahan responded to the Minneapolis YMCA, where David Smith, a Black man, was in the midst of a mental-health crisis.

98.     The encounter ended with Smith handcuffed behind his back in the prone position.

99.     Despite being handcuffed and controlled, Smith was held in the prone position by Callahan and Gorman for at least 4-1/2 minutes, with Gorman kneeing on Smith's back and Callahan straddling his thigh/buttocks region.

100.    Smith had no pulse and showed no signs of life by the time Callahan and Gorman finally made any effort to observe his medical condition.

101.   Hennepin County Chief Medical Examiner Andrew Baker determined that Smith's death was a homicide, and that the cause of death was anoxic encephalopathy due to or as a consequence of cardiopulmonary arrest caused by mechanical asphyxia.

102.   Every then-employed MPD officer (including Defendants Chauvin, Domek, and Peterson) knew about the Smith incident.

103.   The Smith incident was a clear example of excessive force against a Black man—Gorman kneed on Smith's back while Smith was handcuffed and fully controlled. No reasonable officer could believe that the use of such force was objectively reasonable.

104.   Yet, MPD took no disciplinary action against Callahan or Gorman and, instead, deemed their actions consistent with policy and training.  MPD Spokesman John Elder said the following regarding the Smith incident:  "As tragic as the incident was, the officers tried their best, and if mistakes were made they were done so under the standard law enforcement practices and training at the time."

105.   Elder's ridiculous statement is but one example of MPD's ratification of patently unreasonable force decisions by its officers.

106.   The City paid $3,000,000 to settle the Smith family's lawsuit.  But rather than deal with the core problem of unchecked and undisciplined use of excessive force by its officers, particularly against Black persons, the City's taxpayers paid for it to continue.

107.   Indeed, Elder's statement was no accident.  From at least April 2012 through George Floyd's death in May 2020, MPD policy 5-311 allowed officers to

employ "neck restraints" on subjects, defining such restraints as "non-deadly force" despite their obvious risks.

108.   MPD policy defined a neck restraint as "[c]ompressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck)."  MPD trained its officers that a "proper" neck restraint – as if such a thing exists – required officers to "[c]ompress veins, arteries, nerves & muscles of the neck."

109.   MPD trained officers that such a restraint was "non-deadly force" even though it carried with it a reasonable likelihood of death or serious bodily harm.

110.   Consistent with this policy, training materials provided in 2014 to MPD officers (including Defendant Chauvin) depict an officer kneeing on the neck of a handcuffed arrestee in a prone position.

111.   Restraining arrestees by the neck in this matter is inherently dangerous.

112.   Nevertheless, MPD actively encouraged and condoned the use of such restraint at all times material herein.

113.   The MPD has used neck restraints in over 230 arrests since 2015.  44 of those individuals were rendered *unconscious*, 60% of whom were Black.[8]

---

[8] https://www.blackenterprise.com/minneapolis-police-have-used-neck-restraints-in-over-200-arrests-since-2015-leaving-dozens-unconscious/

## THE CITY ALLOWS DEFENDANT CHAUVIN TO RUN AMOK

114.   Defendant Chauvin, like MPD officers Bronson, Pucely, Thao, and many others, engaged in repeated misconduct with the City's tacit authorization.  Indeed, Defendant Chauvin was a serial predator, repeatedly stalking and attacking vulnerable persons of color, whether they be minors, mentally ill, or otherwise – they were all prey!

115.   Defendant Chauvin became an MPD officer in 2001.  This provided him over fifteen years to steep in the culture that led officers to understand they were free to use excessive force with impunity.

116.   Prior to his encounter with John on September 4, 2017, Defendant Chauvin had at least sixteen civilian complaints levied against him.  The only consequence of these complaints was, at most, two letters of reprimand.

117.   In 2005, Defendant Chauvin participated in a reckless police chase resulting in three deaths.

118.   In another incident in November 2013, Defendant Chauvin and other officers pulled over LeSean Braddock, a Black mental-health worker at Hennepin County Medical Center.  They roughly dragged him from his car and slammed him to the ground, then kneed on his neck and back as he lie prone.

119.   Each of these incidents resulted in a complaint being lodged against Defendant Chauvin with the MPD.  Yet none resulted in any discipline being imposed upon him.  Instead, the MPD perversely responded by allowing Defendant Chauvin to assume the role of field-training officer.

22

120.    The failure to level any real discipline against him or other MPD officers caused Defendant Chauvin to freely and openly violate John's constitutional rights on September 4, 2017.

121.    Notably, just three months before his use of excessive force against John, Defendant Chauvin used excessive force in a similar manner against Zoya Code, a Black woman with mental-health problems.

122.    In that instance, Defendant Chauvin dragged Code out of a residence by her handcuffed-behind-the-back arms, gratuitously dropped her face down onto the ground outside, and then kneed on her neck for nearly five minutes.

123.    Code, like John, was subjected to excessive force by Defendant Chauvin. Defendant Chauvin employed his signature move against each, subjugating these Black citizens by pressing down on them with his knee to their necks after they had already been handcuffed and posed no threat.

124.    Indeed, both were subjected to *deadly* force by Defendant Chauvin.  Both reasonably feared for their lives.

125.    Despite knowledge of Defendant Chauvin's long history of misconduct, the evidence of which (including the incident involving John) is under the City's and MPD's control and archived in Evidence.com – the storage system created by the City's BWC manufacturer (AXON) to be a "comprehensive evidence management system" to make "evidence more manageable" – City policymakers allowed Defendant Chauvin to stay on the force long enough to murder George Floyd on May 25, 2020.

126.    Defendant Chauvin killed Floyd using his signature move – a knee to the neck – which, although deadly force as applied to John and Zoya Code, miraculously had not yet killed someone before Floyd's murder.

127.    Defendant Chauvin violated all of their civil rights—and likely many others'—with the City's express or tacit approval.

128.    Indeed, Defendant Chauvin's signature move even against handcuffed and controlled arrestees had already been met with approval by MPD policymakers, after David Smith was killed – resulting in a multi-million-dollar settlement – without any disciplinary measures taken against the offending officers.  Instead, the City continued to train its officers that kneeing on the necks of subdued arrestees was appropriate and lawful.

### THE INCIDENT WITH JOHN

129.    At approximately 8:36 pm on September 4, 2017, MPD officers were dispatched to a home located on Chicago Avenue in Minneapolis on a report of a domestic assault.

130.    John lived at the home with his mother, Deanna Jenkins, and his sister, Krystal Pope.

131.    Defendant Chauvin and his partner, Defendant Walls, responded to the call.

132.    Defendant Walls was in field training at the time and Defendant Chauvin was his field-training officer.

24

133.    Defendants Chauvin and Walls were wearing BWCs that captured some of the subsequent events.

134.    The officers drove to the home on Chicago Avenue without lights or sirens activated, arriving at approximately 01:45:00 on their BWCs (8:45 pm).[9]

135.    The officers exited their squad car and slowly approached the front door of the house on foot.  The house's exterior lights were not on.

136.    Defendant Walls knocked on the door several times before Jenkins finally opened it, and the officers went inside.

137.    The house was quiet and peaceful.  The officers proceeded to follow Jenkins from a dark living room into a lighted kitchen.

138.    At approximately 01:47:00 on the BWC video, Defendant Walls radioed from inside the home that the officers were "Code 4," meaning the situation was under control and no further assistance was needed.

139.    In the kitchen, the officers spoke with Jenkins.  She was clearly and obviously drunk during their conversation.

140.    Jenkins told the officers she wanted John and Krystal removed from the home.

---

[9] The officers' BWCs recorded time stamps followed by the letter Z, *e.g.*, 02:12:30Z, indicating "Zulu" time, or Greenwich Mean Time.  On September 4, 2017, Minneapolis was in Central Daylight Time, which was five hours behind Greenwich Mean Time. Thus, a time stamp of 01:45:00Z corresponded to 8:45:00 pm Central Daylight Time.

141.    Jenkins explained that she had become angry at John and Krystal because they had ignored her admonition to remove cell-phone chargers from wall plugs when not in use, as she believed leaving them plugged in would run up her electric bill.  As a result, she had unplugged and taken John's and Krystal's cell-phone chargers.

142.    Jenkins told the officers that in response to taking the chargers, John had come up from behind her and "grabbed me and just started wrestling me or whatever" and that Krystal had also made contact with her.

143.    Jenkins repeatedly told the officers that John was only 14 years old and that Krystal was 16 years old and pregnant.

144.    Jenkins spoke slowly, calmly, and softly to the officers.  At no point did she tell the officers that she had been injured, and she did not show the officers any injuries.

145.    The scene inside the house was tranquil – so much so that at one point, Defendant Chauvin asked Jenkins, "Did they [meaning John and Krystal] leave?"

146.    Around 01:52:00 on the BWC video, Defendant Walls exited the house and returned to the squad car, where he used his squad computer to print out domestic-assault paperwork for Jenkins to complete.  He then reentered the home.

147.    Over approximately the next 10 minutes, Jenkins filled out the paperwork while sitting on a couch in the living room.  Defendant Chauvin stood relaxedly and idly nearby.

148.    At approximately 02:02:00 on the BWC video, Jenkins handed the completed paperwork to Defendant Walls, who passed it to Defendant Chauvin.

Defendant Chauvin looked over the paperwork and told Jenkins that she needed to add more detail, then returned the paperwork to her.

149.   Jenkins spent several additional minutes working on the paperwork before passing it back to the officers.

150.   At approximately 02:07:00 on the BWC video, Defendant Chauvin reviewed the paperwork a second time.  Defendant Walls asked Jenkins some additional questions, including John's and Krystal's dates of birth, over the ensuing minutes.  The conversation continued until approximately 02:12:00, or 9:12 pm.

151.   In all, approximately 26 tranquil minutes had passed since Defendants Chauvin and Walls had arrived at the residence.

152.   At approximately 02:12:30 on the BWC video, Defendants Walls and Chauvin followed Jenkins through the lighted kitchen and into a hallway, which led to an open bedroom door about halfway down the hallway's left side.

153.   John was inside the bedroom, lying on the floor face down, quietly using a cell phone.

154.   As the officers approached the doorway, Defendant Walls called out "John, why don't you come out here?"

155.   But Defendant Walls gave John no chance to comply.  Instead, he proceeded directly into the room at 02:12:54, with Jenkins standing behind him.

156.   Defendant Chauvin remained near the doorway, behind Defendant Walls and watching the events unfold.

157.    Defendant Walls told John that he was under arrest and to stand up.

158.    John responded that his mother had assaulted him and that she was drunk. He told Defendant Walls to verify this with Krystal, who was just down the hall.

159.    Defendant Walls ignored John's response and told him again to stand up. Neither he nor Defendant Chauvin made any attempt to speak with Krystal.

160.    John moved into a sitting position, with his back against a dresser near the corner of the room, as he talked to Defendant Walls.

161.    Defendant Walls repeated his command to John to stand up, becoming louder and more agitated.  John again stated that his mother had assaulted him.

162.    After approximately 25 seconds of similar discussion with Defendant Walls, John began to stand, with his body's left side leaning against the bedroom wall.

163.    Defendant Walls then reached out and grabbed John's right wrist.  John protested that officers should not touch him inside his own house.

164.    Within a second of Defendant Walls grabbing John's right hand, Defendant Chauvin raced in from the doorway.

165.    Defendant Chauvin had a large metal flashlight in his right hand as he raced into the room.

166.    John had not threatened the officers and posed no immediate threat to them or anyone else.  Necessarily, he posed no threat of imminent serious bodily injury or death sufficient to justify the use of deadly force against him.

28

167.    John had not attempted to flee and had nowhere to go, in an enclosed bedroom with its lone exit (the doorway) blocked by Defendants Walls and Chauvin.

168.    John had begun to stand, as ordered by Defendant Walls.  He was not actively resisting arrest.

169.    John was a suspect in an alleged domestic assault that had not caused any demonstrable or complained-of injuries.

170.    No force against John by Defendant Chauvin was necessary or appropriate, let alone deadly force.

171.    Nevertheless, Defendant Chauvin moved straight towards John and, within seconds of entering the room, willfully swung his flashlight at John's head, striking him near his left ear.

172.    John immediately screamed out in pain.

173.    Defendant Chauvin said nothing before striking John with the flashlight. He gave him no commands or warnings before he struck.

174.    Hitting John in the head with a large metal flashlight was likely to cause John serious bodily injury or kill him.  Defendant Chauvin knew this.

175.    Indeed, any reasonable person would understand that hitting an individual in the head with a large metal flashlight creates a substantial risk of causing serious bodily injury or death.

176.    Defendant Chauvin used deadly force against John by striking him in the head with the flashlight.

177.    Defendant Chauvin knew from his training and experience as an MPD officer that striking someone in the head with a flashlight was the use of deadly force.

178.    No significant force, let alone deadly force, was appropriate to use against John under the Constitution, MPD policy, or plain common sense.

179.    After Defendant Chauvin hit John in the head with the flashlight, John began to fall backwards towards the corner of the room.

180.    Defendant Chauvin then struck John in the head with his flashlight a second time.

181.    John once again screamed out in pain.  His mother also screamed, as did Krystal, who by then had entered the room and observed the officers attacking 14-year-old John.

182.    The force of Defendant Chauvin's violent assault on John caused his body-worn camera to fall off his uniform and onto the floor.  Nevertheless, Defendant Walls's camera continued to capture some of the events, and Defendant Chauvin's camera continued to record pertinent audio.

183.    After striking John with the flashlight a second time, Defendant Chauvin made a C shape with his left hand, grabbed John around the throat with it, and pinned him against the wall.

184.    With John so pinned, Defendant Chauvin screamed at him to get down on the floor.  It was impossible for John to comply while he was being held against the wall in this fashion.

185.    The officers then attempted to force John face down onto the bedroom floor, unsuccessfully.

186.    Then, Defendant Chauvin struck John in the head with the flashlight at least two additional times.  John continued to scream out in pain and terror, fearing that the officers would kill him.

187.    Jenkins told the officers that they were hurting John and reminded them that he was only 14.  She implored them not to kill her son at least four separate times.

188.    At 02:14:06 on Defendant Walls's BWC video – less than a minute after Defendant Chauvin had entered the bedroom – Defendant Chauvin called out "Tase him!" four times.

189.    Instead of using a Taser, Defendant Chauvin – who by then was sitting on the floor behind John, who was also on the floor – wrapped his left arm around John's neck from behind and locked it tightly in place with his right arm, executing a rear naked chokehold.

190.    Using such a chokehold is inherently dangerous.

191.    John can be seen on Defendant Walls's BWC video struggling to breathe in the chokehold and then falling down further towards the floor.

192.    Shortly after Defendant Chauvin placed John in the chokehold, Defendant Walls's BWC recording stopped.

193.    The officers, however, forced John face-down onto the bedroom floor.

194.    Defendant Chauvin then executed his signature move:  he pinned John to the floor with his body weight, pressing his left knee into John's upper back and neck. He also pushed his left hand into his knee to press down on John with even greater force.

195.    Defendant Chauvin would proceed to hold John in this prone position for more than fifteen minutes, all while John was completely subdued and not resisting.

196.    Over those minutes, John repeatedly cried out that he could not breathe, and recorded BWC audio at times captured John struggling to breathe.  But Defendant Chauvin did not care.  He did nothing in response to John's cries or breathing difficulties and continued to press his knee into John's neck and back.

197.    Jenkins, like John, repeatedly told Defendant Chauvin to remove his knee from John's neck and back.  The BWC videos captured her doing so at least eight times.

198.    Defendant Chauvin did not respond.  He simply continued pushing John into the floor with his knee.

199.    John repeatedly told Defendant Chauvin that he was hurting him.  He cried out in pain.

200.    Defendant Chauvin did not respond.  He simply continued pushing John into the floor with his knee.

201.    Defendant Chauvin's BWC video recorded the sound of handcuffs being applied to John at approximately 02:16:45.

202.    Despite this, Defendant Chauvin continued to press his knee into John's neck and back.

203.   At various times on the BWC videos, it can be seen that John stops moving.

204.   John lost consciousness while Defendant Chauvin pressed his knee into John's neck and back.

205.   Meanwhile, during their attempts to take John to the floor, one of the officers had radioed for help, and numerous officers raced to the scene, with the first arriving at approximately 02:18:00 on BWC video.

206.   On the officers' way to the house, either Defendant Chauvin on Defendant Walls radioed at 02:15:15 that the situation was "Code 4" or under control.  Chauvin, however, continued pressing his knee into John's neck and back anyway, pinning him to the floor gratuitously and with no efforts by anyone else to stop him.

207.   Indeed, at least eight officers, including Defendants Domek, Nerling, Plys, Robins, and Peterson, responded to the house and observed Defendant Chauvin with his knee across John's neck and back while John was face down, handcuffed, and not resisting.  He was barely moving under Defendant Chauvin's knee.

208.   Each of these individuals had the opportunity, and indeed the duty, to intervene and stop Defendant Chauvin's unlawful use of force against John.  None did.

209.   None of the individual Defendants told Defendant Chauvin to remove his knee from John's neck and back, roll him over, or take any other steps to protect John from the gratuitous use of force.

210.   Rather, the officers openly approved of Defendant Chauvin's conduct.

33

211.   As he exited the house, for example, Defendant Robins's BWC recorded John's mother sitting on the couch in the living room, stating "It's not alright to hit my son with a flashlight." Defendant Robins responded, "when he's fighting, yeah it is."

212.   Similarly, Defendant Walls was captured on his BWC video stating that John had "started fighting with us." Another unknown officer responded, "don't fight with the cops."

213.   At no point in time was John "fighting" with the officers.

214.   At approximately 02:29:00 on the BWC videos, paramedics arrived at the home and entered the bedroom, where Defendant Chauvin remained kneeing on the neck and back of the handcuffed, non-resisting, and not-moving John.

215.   Defendant Chauvin did not let up on John even after paramedics arrived. He continued kneeing on his neck and back.

216.   John, prone and pinned to the floor, told the paramedics that he had been hit with a flashlight by a police officer and that he had blacked out.

217.   One of the paramedics examined the left side of John's head and announced that he was going to need stitches. Indeed, John had been bleeding profusely onto the bedroom carpet after being struck with the flashlight.

218.   Despite knowing that John would have to be transported to the hospital for stitches, Defendant Chauvin still did not remove his knee from John's neck and back.

219.   At approximately 02:32:00 on the BWC video, Defendant Chauvin finally removed his knee. Officers rolled John over and stood him up.

34

220.    The officers then walked John from the home to a waiting ambulance.

Inside, paramedics reiterated that John would need stitches for a cut on his left ear.

221.    The ambulance then drove to Hennepin County Medical Center (HCMC).

Defendant Walls rode in the ambulance with John.

222.    HCMC is the preferred hospital for MPD officers to transport arrestees.  At

least one of its Board members has acknowledged that HCMC has a "deeply rooted"

culture of systemic racism,[10] and some of its staff physicians have long moonlighted as

law-enforcement officers.[11]

223.    On the ride to HCMC, a paramedic asked John what had happened.

224.    John told the paramedic that Defendant Chauvin "belted me in my face"

with a flashlight.

225.    John also told the paramedic that Defendant Chauvin held his knee across

John's neck and back and he "pushed down harder every time I told him it hurts."

226.    John told the paramedic that he blacked out from the assault.

227.    Once at HCMC, John reiterated the same information, telling a doctor that

he was hit with a flashlight, put in a chokehold, and had lost consciousness.  Despite this,

the doctor later put in a written report that John had *denied* losing consciousness.

---

[10] https://www.startribune.com/hennepin-county-commissioner-calls-on-hcmc-to-fire-employees-demote-supervisors-over-systemic-racism/600152487/
[11] https://www.startribune.com/cop-or-doctor-in-new-policy-hennepin-healthcare-tells-physicians-to-choose-one-job/600161821/

228.    The doctor stitched the laceration to John's ear.  But no imaging to assess John for facial fractures or any type of brain injury was performed, despite Defendant Chauvin having struck John in the head multiple times with a large metal flashlight.

229.    Defendant Sergeant Peterson traveled to HCMC and interviewed John as he was being treated.  He took a statement from John while he was handcuffed to a gurney in the emergency room.  John was not read his *Miranda* rights during this custodial interrogation.

230.    John told Defendant Sergeant Peterson that his mother was drunk and that the officers failed to ask him what had happened before placing him under arrest.

231.    Defendant Sergeant Peterson responded that he had just spoken with John's mother at length and agreed that she was drunk.

232.    John also told Defendant Sergeant Peterson that Defendant Chauvin had struck him in the face and kept his knee across John's back even after he had been handcuffed.  He told Defendant Sergeant Peterson that he repeatedly asked Defendant Chauvin to get off his back, to no avail.  He also reported that he asked *other* officers to tell Defendant Chauvin to remove his knee, but nothing was done.

233.    Attempting to cover for his brothers in blue, Defendant Sergeant Peterson responded by accusing John of fighting with the officers.  John denied doing so.

234.    Defendant Sergeant Peterson then told John that "merely not cooperating" was the same as fighting because John was "big."

235.   "Merely not cooperating" is not fighting.  Regardless, "fighting" is not a talisman for police officers to use as much force as they want, including deadly force.

236.   Moreover, a police officer cannot use significant, or deadly, force simply because a person is "big" – particularly when that person is a 14-year-old who has displayed no aggression and is not threatening.

237.   Prior to the Defendant officers' encounter with John, the MPD embraced a militaristic culture where unnecessary drama often was injected into situations by officers.  That is also true of the accusation that John was "fighting," which is belied by the BWC videos of the encounter.

238.   After his ear was stitched, John was discharged from HCMC and Defendants Chauvin and Walls transported him to MPD headquarters, where he was fingerprinted and photographed.  He was then taken to the Juvenile Detention Center, where he was charged with fifth-degree domestic assault (a misdemeanor) and obstructing legal process with force (a gross misdemeanor).

239.   Each of these charges was eventually dropped.

240.   Later on September 4, 2017, Defendant Chauvin prepared a report about the encounter with John.

241.   In that report, Defendant Chauvin lied about his actions that evening and omitted the true extent of his assault against John.

242.   Defendant Chauvin reported that he "deliver[ed] a few strikes to [John] to impact his shoulders."

37

243. This was a lie. Defendant Chauvin willfully and intentionally struck John in his head.

244. Moreover, Defendant Chauvin omitted from his report that he had struck John with *a large metal flashlight*.

245. Defendant Chauvin further reported that he "applied a neck restraint" to John, and he "was then able to roll [John] forward onto his stomach and grab his left wrist so that cuffing could be completed. I then used body weight to pin [John] to the floor."

246. Defendant Chauvin nowhere reported that he had grabbed John by the throat.

247. Defendant Chauvin wrote that he pinned John to the floor, but he nowhere reported that he pinned John *for more than fifteen minutes*, while John was handcuffed and not resisting.

248. Defendant Walls also wrote a report that evening about the encounter with John.

249. Nowhere in his report did Defendant Walls document that Defendant Chauvin struck John in the face with a flashlight multiple times. Nowhere in his report did Defendant Walls document that Defendant Chauvin pinned John to the floor with his knee and held him there long after he had been handcuffed and was not resisting.

250.     Upon information and belief, each of the remaining officers who responded that evening failed to document that Defendant Chauvin had pinned John to the floor with his knee and held him there while he was handcuffed and not resisting.

251.     Defendant Sergeant Peterson later reviewed and *approved* Defendant Chauvin's report and his use of force, despite having firsthand knowledge that the report was false and misleading, in particular having observed Defendant Chauvin unlawfully restraining John with his knee.

252.     The material lies and omissions in the officers' reports are the type that MPD rank and file are accustomed to making without consequence or repercussion from supervisors such as Defendant Sergeant Peterson and those all the way up the chain of command.

## DEFENDANT CHAUVIN MURDERS GEORGE FLOYD AND IS CHARGED

253.     Despite knowledge of the incident concerning John, MPD supervisors failed to discipline Defendant Chauvin for his conduct that day.  He was left free to prowl for more Black persons to subjugate and torture.

254.     The consequences of their inaction were tragic.  On May 25, 2020, Defendant Chauvin murdered George Floyd in broad daylight, using his signature knee to the neck to suffocate Floyd over more than eight minutes.

255.     Had MPD disciplined Defendant Chauvin for his conduct involving John, or even for his conduct involving Zoya Code three months earlier, history could have

been stopped from repeating itself with George Floyd.  But what else could be expected from the MPD?

256.   On April 20, 2021, a Hennepin County jury found Defendant Chauvin guilty of murdering George Floyd.

257.   Approximately two weeks later, on May 6, 2021, a federal grand jury in the District of Minnesota returned an Indictment in case number 21-CR-00108 (PAM/TNL) against Defendant Chauvin, charging him with criminal civil-rights violations in connection with his treatment, and the death, of George Floyd.

258.   That same day, a federal grand jury in the District of Minnesota returned an Indictment in case number 21-CR-00109 (WMW/HB), charging that on September 4, 2017, Defendant Chauvin deprived John of the rights secured and protected by the Constitution of the United States to be free from unreasonable search and seizure, which includes the right to be free from the use of unreasonable force.  A true and correct copy of that Indictment is attached hereto as Exhibit B.

259.   The Indictment regarding Defendant Chauvin's attack of John charged, in Count I, that Defendant Chauvin, without legal justification, held John by the throat and struck him multiple times with a flashlight, a dangerous weapon.  That Indictment, in Count II, further charged that Defendant Chauvin "held his knee on the neck and upper back of [John] even after [John] was lying prone, handcuffed and unresisting."

260.   On December 15, 2021, Defendant Chauvin pleaded guilty to the conduct charged in each of these federal Indictments.  A true and correct copy of Defendant

Chauvin's Plea Agreement and Sentencing Stipulations (the "Plea Agreement") is attached hereto as Exhibit C.

261.    In the Plea Agreement, Defendant Chauvin admitted that, while acting under color of law as an MPD officer on September 4, 2017, he willfully deprived John of his constitutional rights – specifically, the right to be free from an unreasonable seizure, which includes the right to be free from the use of unreasonable force by a police officer.

262.    In the Plea Agreement, Defendant Chauvin admitted that, without legal justification, he held John by the throat and struck him multiple times in the head with a dangerous weapon – namely, his flashlight – resulting in bodily injury to John.

263.    In the Plea Agreement, Defendant Chauvin admitted that, without legal justification, he held his knee on John's neck, shoulders, and upper back even after John was lying prone, handcuffed, and unresisting, resulting in bodily injury to John.

264.    In the Plea Agreement, Defendant Chauvin admitted that "at no point in the encounter did [John] use force or threaten the use of force against the officers" on September 4, 2017.

265.    In the Plea Agreement, Defendant Chauvin admitted that "[t]hroughout the encounter," he "was aware that [John] was 14 years old and that [John] made no aggressive moves towards the officers."

266.    In the Plea Agreement, Defendant Chauvin admitted that "[a]s the officers began to take [John] into custody, [John] attempted to explain the situation with his

mother and pulled away. After this initial encounter, [Defendant Chauvin] used unreasonable and excessive force on [John] by striking him in the head multiple times with a police-issue flashlight. [Defendant Chauvin] then pinned [John] to the wall by his throat and again struck [John] in the head with his flashlight. [Defendant Chauvin's] strikes caused a wound near [John's] left ear."

267.    In the Plea Agreement, Defendant Chauvin "admit[ted] he also used unreasonable and excessive force on [John] by holding his knee on [John's] neck, shoulders, and upper back for between fifteen and sixteen minutes. During this period, [John] was face-down on the floor, handcuffed, and unresisting. During [Defendant Chauvin's] restraint, [John] cooperated with police directions and, at times, cried from pain."

268.    In the Plea Agreement, Defendant Chauvin admitted that his conduct on September 4, 2017, was willful and that he knew, from MPD policies and training, that strikes to the head were considered deadly force and that deadly force was appropriate only when a person presents a risk of death or great bodily harm to the officer.

269.    In the Plea Agreement, Defendant Chauvin also admitted that he had been trained that "if an arrestee is in the prone position, that position may make it more difficult to breathe, and thus, officers should move that arrestee to a side recovery or seated position."

270.    In the Plea Agreement, Defendant Chauvin also admitted that his use of unreasonable force was willful, as "evidenced by the report [he] wrote about the incident

42

in which he omitted that he repeatedly struck [John] in the head with a flashlight, grabbed

[John] by the throat, and used his knee to pin [John] to the ground for more than fifteen

minutes."

271.   And, in the Plea Agreement, Defendant Chauvin admitted that his willful

uses of unreasonable force on September 4, 2017, resulted in bodily injury to John.

272.   Relegated to the status of his preferred victims, Defendant Chauvin finally

had to tell the truth to strike his plea deal.

273.   It is thus established, beyond a reasonable doubt, that Defendant Chauvin

violated John's constitutional rights on September 4, 2017, and did so willfully and

without any legal justification.

## JOHN'S INJURIES

274.   John suffered significant injuries as a result of Defendant Chauvin's

conduct on September 4, 2017, and the other individual Defendants' failure to intervene

to stop it.

275.   John's physical injuries included difficulty breathing, loss of consciousness,

an ear laceration, contusions, and head trauma as a result of Defendant Chauvin's assault.

276.   Whether John suffered cerebral injuries or a traumatic brain injury (TBI) is

unknown, because HCMC failed to perform any scans or other tests that would have

diagnosed such injuries.

277.   In addition to his physical injuries, John has suffered, and will continue to

suffer, significant emotional distress as a result of the assault.  In effect, what remained of

his boyhood was stolen. Indeed, he was and continues to be traumatized by Defendant Chauvin's inhumane treatment and torture.

278.    The United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment defines the word "torture" to mean "an extreme form of cruel and inhuman punishment committed under the color of law." The Convention "allows for no circumstances or emergencies where torture would be permitted."

279.    The United States is a signatory to, and ratifier of, the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

280.    Defendant Chauvin tortured John by subjecting him to extreme cruel and inhuman treatment under color of law. Chauvin treated John like chattel.

281.    John has experienced and continues to experience flashbacks to the night in question, reliving the incident over and over again in his head. He has difficulty sleeping and experiences recurrent nightmares. He now irritates easily and finds himself constantly on edge, frequently experiencing worry and fear and feelings of being overwhelmed, none of which was true before the assault.

282.    Defendant Chauvin is the most notorious police officer in Minnesota – if not United States – history. This exacerbates John's emotional suffering and increases the frequency of his flashbacks, as Defendant Chauvin's name is repeatedly in the news. Indeed, every person in this state likely knows the name Derek Chauvin; John cannot

easily avoid hearing about him, emotionally bringing him back on a near-daily basis to September 4, 2017, when he reasonably believed Defendant Chauvin would kill him.

283.    John has difficulty discussing with others the events of September 4, 2017. He is guarded and hesitant to relive the trauma.

284.    John also experiences hypervigilance while in the community, a mistrust of the police, and significant anxiety when interacting with police officers and others.

285.    John has suffered and will continue to suffer from post-traumatic stress disorder (PTSD) well into adulthood, if not for the rest of his life.

286.    John continues to attend counseling and therapy to address his significant emotional distress and PTSD resulting from the events of September 4, 2017.

287.    To date, John has incurred medical expenses totaling approximately $7,400 as a result of those events.

## COUNT I

### FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Derek Chauvin in his individual capacity*

288.    John realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

289.    By the actions described above, Defendant Derek Chauvin, under color of state law, violated and deprived John of his clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

290.    Defendant Chauvin subjected John to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

291.    As a direct and proximate result of the acts and omissions of Defendant Chauvin, John suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount to be determined by the jury.

292.    Punitive damages in an amount to be determined by the jury are available against Defendant Chauvin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

293.    John is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### RACE DISCRIMINATION – FOURTEENTH AMENDMENT VIOLATION
*Plaintiff v. Defendant Derek Chauvin in his individual capacity*

294.    John realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

295.    The United States Constitution prohibits selective enforcement of the law based on considerations of race.

296.    Specifically, the Equal Protection Clause of the Fourteenth Amendment prohibits intentionally discriminatory policing by members of law enforcement.

46

297.    By the actions described above, Defendant Derek Chauvin, under color of state law, violated and deprived John of his clearly established and well-settled civil rights to be free from race discrimination under the Fourteenth Amendment to the United States Constitution.

298.    John's race (Black) was the but-for cause of Defendant Chauvin's conduct against John on September 4, 2017.

299.    Defendant Chauvin subjected John to the deprivation of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

300.    As a direct and proximate result of the acts and omissions of Defendant Chauvin, John suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount to be determined by the jury.

301.    Punitive damages in an amount to be determined by the jury are available against Defendant Chauvin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

302.    John is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendants Alexander Walls, Joshua Domek, David Nerling, Graham Plys,*
*David Robins, and Lucas Peterson in their individual capacities*

303.   John realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

304.   By the actions described above, Defendants Alexander Walls, Joshua Domek, David Nerling, Graham Plys, David Robins, and Lucas Peterson, under color of state law, violated and deprived John of his clearly established and well-settled civil rights under the Fourth and Fourteenth Amendments by failing to intervene in response to Defendant Chauvin's unconstitutional uses of force, with the realistic opportunity to do so.

305.   Defendants Walls, Domek, Nerling, Plys, Robins, and Peterson subjected John to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

306.   As a direct and proximate result of the acts and omissions of Defendants Walls, Domek, Nerling, Plys, Robins, and Peterson, John suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount to be determined by the jury.

307.   Punitive damages in an amount to be determined by the jury are available against each of Defendants Walls, Domek, Nerling, Plys, Robins, and Peterson and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30

48

(1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

308.    John is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT IV

**CIVIL RIGHTS VIOLATIONS**
**MONELL V. DEP'T OF SOCIAL SERVICES**
*Plaintiff v. Defendant City of Minneapolis*

309.    John realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

310.    Before September 4, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers of the improper use of force, including deadly force.

311.    By failing to discipline all officers consistently on this point, City and MPD policymakers, with the department's ratification and approval, have approved of a deficient policy, custom, or practice of the improper use of force, including deadly force.

312.    Further, before September 4, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including Defendant Chauvin herein, of the use of deadly force when none was justified,

49

specifically, the use of neck restraints on arrestees who had been handcuffed or otherwise were under officers' control.

313.    John's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City of Minneapolis is thereby liable in an amount to be determined by the jury.

314.    John is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V

### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d *et seq.*
*Plaintiff v. Defendant City of Minneapolis*

315.    John realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

316.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination based on race by entities that receive federal financial assistance.

317.    The City of Minneapolis and the MPD receive federal financial assistance.

318.    The City of Minneapolis, through the MPD, has engaged and continues to engage in a pattern and practice of race discrimination in its policing practices.

319.    As set forth above, MPD stops, arrests, and uses force against Black individuals at significantly higher rates than white individuals in similar circumstances.

320.    The disproportionate impact of policing practices on Black individuals, and the failure to address it despite knowledge by City and MPD leaders, evidences a policy or custom of intentional race discrimination by the MPD.

321.    John's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's and MPD's customs, patterns, and/or practices, and the City of Minneapolis is thereby liable in an amount to be determined by the jury.

322.     John is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Christopher Pope, Jr. prays for judgment as follows:

1.    That this Court find that the Defendants committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983, and Title VI of the Civil Rights Act;

2.    As to Count I, a money judgment against Defendant Chauvin for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.    As to Count II, a money judgment against Defendant Chauvin for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

51

4.      As to Count III, a money judgment against each of Defendants Walls, Domek, Nerling, Robins, Plys, and Peterson for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against the City of Minneapolis for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against the City of Minneapolis for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

7.      For an order mandating changes in the policies and procedures of the Minneapolis Police Department requiring, among other things, policy and training measures in the proper use of restraint techniques and the risks of positional asphyxia, the proper reporting of use of force, and the obligation to intervene when observing the unlawful use of force by other officers; and

8.      For such other and further relief as this Court may deem just and equitable.

**JOHN DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE**

Dated:  May 31, 2022

**ROBINS KAPLAN LLP**

s/Robert Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Greta A. Wiessner, #0401130
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
gwiessner@robinskaplan.com

***Attorneys for Plaintiff John Christopher Pope, Jr.***